UNITED STATES of America, Plaintiff,

v.

Amelia COVARRUBIA, Defendant.

Criminal No. 94–161 MV.

United States District Court,
D. New Mexico.

Sept. 2, 1994.

Kelly H. Burnham, Asst. U.S. Atty., Las Cruces, New Mexico, for plaintiff.

Barbara A. Mandel, Asst. Federal Public Defender, Las Cruces, New Mexico, for defendant.

## MEMORANDUM OPINION AND ORDER

VAZQUEZ, District Judge.

The subject of this Memorandum Opinion and Order is Defendant Amelia Covarrubia's motion to suppress physical evidence, filed April 12, 1994. A hearing was held on this matter, July 21, 1994. After careful consideration of the facts in this case, the briefs of the parties, and the relevant case law, the Court finds that defendant's motion should be **granted.**

## BACKGROUND

On February 28, 1994, at approximately 8:50 p.m., Defendant Amelia Covarrubia was traveling westbound on Anapra Road in a 1974 Chevrolet with a New Mexico license plate. As Ms. Covarrubia approached the main intersection of the town of Columbus,[1] New Mexico, from Anapra Road, she noticed a Border Patrol agent in a marked unit positioned close to the northeast corner of the intersection. Ms. Covarrubia glanced towards the Border Patrol agent's vehicle, stopped at the stop sign, looked around to see if traffic was coming, and turned right (north) onto Highway 11.[2] Anapra Road is a well-known drug and alien smuggling route which is situated three miles north of the Mexican border and which runs east/west from El Paso, Texas, to Columbus, New Mexico, a distance of approximately 47 miles. Highway 11 is the main thoroughfare running north from Palomas, Mexico, to Deming, New Mexico.

Border Patrol Agent Michael Harrison, who was located at the intersection, has been a Border Patrol Agent for approximately 12 years. He considered Ms. Covarrubia's presence at the intersection to be suspicious. According to the agent, normally no local traffic travels at 8:50 p.m. and the vast majority of vehicles that approaches the Anapra Road/Highway 11 intersection travels south. Agent Harrison testified that normal traffic will not go north; "it's smugglers" that go north from Anapra Road. However, Agent Harrison conceded on cross-examination that not all traffic that turns north onto Highway 11 is illegitimate and that there are several residences and a motel located on Highway 11 north of Anapra Road that could account for perfectly lawful travel.[3] Agent Harrison could not estimate how many vehicles he had stopped turning north from Anapra Road onto Highway 11, nor how many of these stops uncovered criminal activity involving the transportation of illegal aliens.

Agent Harrison testified that he found it "suspicious" that defendant's vehicle had an "out-of-county" license plate, specifically a Dona Ana license plate, because he felt that a vehicle from Dona Ana County would have no legitimate reason for traveling along Anapra Road and turning north towards Deming, New Mexico. He also testified that he found

---

1. Columbus, New Mexico, has a population of approximately 600.

2. Agent Harrison, who was the Border Patrol agent located at the Anapra Road/Highway 11 intersection, testified that defendant looked at him three times and that she waited at the stop sign for approximately one minute. The agent, however, omitted any reference to these facts in his police report and the Court finds that this testimony was not credible.

3. It is also noteworthy that Agent Harrison was alerted by means of sensors to the presence of Ms. Covarrubia on Anapra Road for some time before she reached the intersection. The sensors indicated that Ms. Covarrubia had not stopped along Anapra Road. Thus, Agent Harrison was aware that she did not stop to pick up illegal aliens along Anapra Road and there was no objective indication that defendant had crossed the border. *Cf. United States v. Sperow*, 551 F.2d 808, 809 (10th Cir.1977) (sensors located east and west of defendant's vehicle indicated that defendant, who was traveling westbound, approximately one and one-half miles from the Mexican border, had crossed the border).

it suspicious that defendant's vehicle was big and old, of the type often used to transport illegal drugs or illegal aliens. However, Agent Harrison conceded that such a vehicle is very common in the Columbus area of New Mexico.

In addition, Agent Harrison testified that he found it suspicious that defendant, a female, was traveling alone at 8:50 p.m. on Anapra Road. His suspicions were further raised when defendant turned and looked at him and when she stopped at the stop sign before turning north onto Highway 11. Armed with these "suspicions," Agent Harrison decided to follow defendant by traveling along a sidestreet that paralleled Highway 11. After following defendant for about five or six blocks, he then turned onto Highway 11 and pulled in behind defendant in order to check her plates. At this point, defendant noticed the Border Patrol vehicle pull in behind her as she traveled northbound on Highway 11.[4] Shortly after this, she observed the emergency lights on the agent's vehicle and she believed that the agent was trying to pull her over. Defendant turned right onto North Boundary, which was the first available right-hand turn, and after making the turn she immediately stopped for

the Border Patrol agent.[5] Rather than stopping on Highway 11, defendant believed it would be safer to make a right turn and stop on North Boundary. Agent Harrison characterized defendant's right-hand turn as an "abrupt" turn and perceived it as an attempt to evade him. Agent Harrison testified that based on the aforementioned factors he stopped defendant because he believed she was transporting illegal aliens.[6] It is undisputed that North Boundary is the most northerly thoroughfare in Columbus along which a residential "neighborhood" is located. The residential "neighborhood" is situated west of Highway 11 and to the east of Highway 11 is a school and a swimming pool. East of the school and swimming pool it is unknown what buildings, residential or otherwise, are present and where, if anywhere, North Boundary leads.

Upon approaching defendant's vehicle, Agent Harrison noticed that defendant was Hispanic. He also noticed in plain view two bundles of what he suspected was marijuana wrapped with yellow nylon rope. Defendant subsequently consented to a search of the trunk and Agent Harrison discovered several more bundles of suspected marijuana. The

4. Agent Harrison, by contrast, testified that as defendant traveled northbound on Highway 11 she glanced over at him five times. Based on several factors, the Court did not find this testimony credible. First, it was dark and apart from the area close to the intersection, Highway 11 was poorly lit. Second, a close review of a video tape (Defendant's Exhibit C) depicting the area revealed that there are several buildings and other obstacles between Highway 11 and the sidestreet on which Agent Harrison was traveling which would have partially obstructed the agent's view of the defendant. The Court found defendant's testimony that she was not aware of the agent's presence until he pulled in behind her onto Highway 11 to be credible.

5. The stop took place approximately four miles from the Mexican border.

6. Agent Harrison also testified at the hearing that he observed a pickup truck traveling along Anapra Road approximately three minutes in front of defendant. He testified that he believed the truck may have been a "scout" vehicle for the defendant. The pickup truck turned north on Highway 11 and another Border Patrol agent followed it. However, ultimately the pickup truck turned into a residential neighborhood

along North Boundary and the driver disappeared into a house. A determination was then made that the pickup truck was a local vehicle. There was no link established whatsoever between the pickup truck and the defendant's vehicle other than the proximity in time. (Cf. *United States v. Barnard*, 553 F.2d 389, 391–392 (5th Cir.1977) (in addition to traveling within one mile of each other, both vehicles had CB antennae; the first vehicle had a visible microphone into which the driver appeared to be talking; both vehicles were from the same county; the second vehicle was heavily loaded; and the vehicles were traveling in a sparsely populated and densely vegetated area). The Court finds that Agent Harrison's suspicion that defendant was involved in transporting illegal aliens is not rationally inferable from the mere presence of the pickup truck traveling within three minutes of defendant's vehicle. To find otherwise would risk subjecting countless motorists, who happen to travel within three minutes of another vehicle, to the whim of Border Patrol agents. Furthermore, Agent Harrison omitted any reference to the pickup truck in his police report. As such, the Court considers that this was not a factor that entered into Agent Harrison's determination to stop defendant's vehicle and, in fact, has all the flavor of an after-the-fact justification for the stop.

bundles were later determined to be marijuana. Although Agent Harrison originally suspected that defendant was transporting illegal aliens, and stopped her vehicle based on that suspicion, his suspicion changed when he observed the bundles of marijuana in the car.

Defendant argues that Agent Harrison did not have reasonable suspicion to support the stop of defendant's vehicle because defendant's conduct was not unusual much less indicative of criminal conduct. Defendant contends that Agent Harrison acted upon a mere hunch. The government argues that Agent Harrison had reasonable suspicion to stop defendant's vehicle based on numerous factors, including most significantly the following: Defendant was traveling on Anapra Road, a notorious thoroughfare for alien and drug smuggling, located three miles from the Mexican border; when defendant stopped at the intersection of Anapra Road and Highway 11, she turned and looked at the Border Patrol Agent; defendant turned right (north) onto Highway 11, which is suspicious because most legitimate traffic turns left; defendant made an abrupt right-hand turn after Agent Harrison pulled in behind her on Highway 11.[7] For the reasons set out below, the Court finds that the government has not met its burden of establishing that Agent Harrison had reasonable suspicion to stop defendant's vehicle.

## ANALYSIS

■ Stops by Border Patrol agents on roving patrol may be justified under circumstances less than those constituting probable cause for arrest or search.[8] *See United States v. Brignoni–Ponce,* 422 U.S. 873, 880, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975). Border Patrol agents on roving patrol may stop vehicles only if they are aware of "specific and articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicle contains aliens who may be illegally in the country." *Id.* at 884, 95 S.Ct. at 2582, extending *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) to the roving patrol context.[9] Stated alternatively, an investigatory stop is justified when an officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884. One of the purposes of the objective requirement of reasonable suspicion is to assure that law enforcement officers do not arbitrarily stop vehicles based on nothing more substantial than inarticulate hunches.[10]

■ In determining whether there is reasonable suspicion to stop a car in the border area, officers may consider any number of relevant factors, including: (1) characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily

---

7. The government also argued that while driving parallel to defendant's vehicle, the agent saw defendant continually turning to see where the agent was located. This factor, for the reasons set out above, has not been considered in the Court's determination of reasonable suspicion.

8. In *Brignoni–Ponce,* the Court arrived at a standard requiring less than probable cause by balancing the public interest in controlling the large-scale illegal entry of unauthorized aliens at the Mexican border, the difficulty of enforcing the law along a long border, and the use of illegal aliens as a source for cheap labor, against the interference with individual liberty involved in stopping and questioning persons suspected of being illegal aliens. *Id.* at 880, 95 S.Ct. at 2580.

9. The Court in *Brignoni–Ponce* declared that the requirement of reasonable suspicion for stops allows the Government adequate means of guarding the public interest and also protects residents of the border areas from indiscriminate official interference. *Id.* at 883, 95 S.Ct. at 2581.

10. The Court noted that subjective good faith on the part of an officer in stopping a vehicle would not be enough to comport with the Fourth Amendment. If that were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers, and effects, only in the discretion of the police." *Id.* 392 U.S. at 22, 88 S.Ct. at 1880. *citing Beck v. Ohio,* 379 U.S. 89, 97, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964).

loaded. *Brignoni–Ponce*, 422 U.S. at 884–885, 95 S.Ct. at 2582.

The United States Supreme Court decision in *Brignoni–Ponce* provides only limited guidance to lower courts. It did not specify how many of the enumerated factors must be present or how much weight should be afforded to each of the factors.[11] In *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), the Court provided more guidance to lower courts. The Court stated:

> Terms like "articulable reasons" and "founded supsicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—*the whole picture*—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of "criminal activity." *Id.* at 417–418, 101 S.Ct. at 695.[12]

In analyzing the picture as a whole, it must be remembered that "not every suspicion that is articulable is reasonable." *United States v. Miranda–Enriquez*, 941 F.2d 1081, 1083 (10th Cir.1991), *citing United States v. Monsisvais*, 907 F.2d 987, 992 (10th Cir. 1990).

In light of the above legal standards, the Court now analyses the facts in this case. Agent Harrison stopped defendant's vehicle because he believed that she was transporting illegal aliens. He testified that he relied upon the following factors in determining

that he had reasonable suspicion to stop defendant's vehicle; Anapra Road is a notorious drug and alien smuggling route; defendant was traveling at 8:50 p.m.; defendant, a female, was traveling alone after dark on Anapra Road; defendant drove a big, old vehicle; defendant's vehicle had Dona Ana license plates; defendant glanced at Agent Harrison as she stopped at the Anapra Road/Highway 11 intersection; defendant turned right onto Highway 11; defendant drove slowly northbound on Highway 11 and glanced over five times at the agent as he drove parallel to her vehicle; when the agent pulled in behind her, she accelerated and took an "abrupt" right turn at the first opportunity. The Court finds that when these factors are ascribed appropriate weight and viewed in light of the "whole picture," Agent Harrison did not have reasonable suspicion to believe that defendant was involved in smuggling illegal aliens.

Some of the factors that Agent Harrison apparently relied upon in determining whether he had reasonable suspicion to stop defendant's vehicle do not withstand rational scrutiny. At the hearing, he articulated that it was "suspicious" that defendant was driving a car with a Dona Ana license plate.[13] In his opinion, a car with a Dona Ana license plate would not legitimately travel along Anapra Road in order to travel to Deming. Instead, such a car would take I–10 directly from Las Cruces to Deming. However, there was no testimony that vehicles with Dona Ana license plates were any more likely to be transporting aliens than vehicles with local license plates, license plates from out-

---

**11.** In *Brignoni–Ponce*, the Court held that the stop of a vehicle by Border Patrol agents based solely on the Mexican appearance of the occupants of a car did not constitute reasonable suspicion. Although, the Mexican appearance of passengers, detectable from such factors as mode of dress and haircut could be a factor to consider, it was insufficient alone to create the reasonable belief necessary to stop a person away from the border and question him concerning his nationality. *Id.* 422 U.S. at 885, 95 S.Ct. at 2582. Thus, the facts of this case place it at the extreme end of the "reasonable suspicion" spectrum where only one factor was presented justifying the stop.

**12.** Unfortunately, the guidance provided by the Court in *Cortez* in determining what factors are

sufficient to constitute "reasonable suspicion" is limited. In *Cortez*, a wealth of information gathered from a detailed investigation created reasonable suspicion to justify the stop. Thus, the facts in *Cortez* place it at the extreme end of the spectrum from *Brignoni–Ponce*.

**13.** In his police report, Agent Harrison did not mention that defendant's vehicle had a **Dona Ana** license plate. This omission leads the Court to conclude that the characterization of the Dona Ana license plate as a "suspicious" factor is an after-the-fact justification for the stop and did not, in fact, enter into Agent Harrison's decision to stop defendant's vehicle.

side the county, or out-of-state license plates. *See Monsisvais,* 907 F.2d at 991 (the Court could not attach any particular significance to the appearance of Arizona license plates in the area of the stop because although Arizona cars must certainly have been less common on that stretch of road than those bearing New Mexico plates, there was no basis in the record from which to conclude that Arizona-plated vehicles were any more likely to be transporting aliens near Truth or Consequences than were vehicles bearing the license plates of New Mexico or, for that matter, Texas or Colorado.). Agent Harrison could not provide the Court with any information suggesting that a disproportionate number of vehicles with Dona Ana license plates transports illegal aliens. In fact, Agent Harrison did not testify to one single instance where he had stopped a vehicle with Dona Ana license plates and uncovered criminal activity involving the transportation of illegal aliens. Nor was there any testimony that Dona Ana County was a common destination for loads of illegal aliens. *Cf. United States v. Pollack,* 895 F.2d 686 (10th Cir. 1990) (a significant factor in upholding the Border Patrol Agent's stop of defendant's vehicle was that it bore Colorado license plates, since Colorado was "a common destination for loads of illegal aliens." *Id.* at 687). Thus, the Court cannot ascribe any particular significance to the fact that defendant's vehicle bore Dona Ana license plates. Agent Harrison's assumptions,[14] speculations, and conclusions about the appearance of a car with Dona Ana license plates in Columbus, New Mexico, are insufficient to support a reasonable inference that defendant was engaged in criminal activity.

■ Agent Harrison testified that Anapra Road could be used to "circumvent" the I–10 checkpoint, west of Las Cruces, or the I–25 checkpoint, near Truth or Consequences. Without more information about the approximate time it takes to travel from El Paso to Deming via Anapra Road and Highway 11, as opposed to the time it takes to travel from El Paso to Deming along I–10, and without information about the relative conditions of the roads and the scenery along the different routes, it is impossible for the Court to objectively conclude that a vehicle traveling along Anapra Road is "circumventing" the checkpoints located further north. There was no testimony that the majority of traffic on Anapra Road was illegitimate or that the sole purpose of motorists using Anapra Road was to "circumvent" the checkpoints. The location of Columbus, between El Paso and Deming, which has a population of 600, several tourist attractions, a motel, and at least one residential "neighborhood" further negates the characterization of Anapra Road as a "circumvention route" for checkpoints located further north. Certainly, the Court cannot equate Anapra Road with the seldom traveled, sparsely populated highways that are commonly used to circumvent the I–25 checkpoint near Truth or Consequences-highways with which the Tenth Circuit is all too-well acquainted. Agent Harrison's convenient characterization of Anapra Road as a "circumvention route" does not appear to rest upon any objective basis.

■ Agent Harrison also testified that it was suspicious that Ms. Covarrubia was traveling on Anapra Road at 8:50 p.m. after dark. The Court, however, cannot ascribe any particular significance to this fact because there was no evidence presented indicating that vehicles transporting illegal aliens were any more likely to be traveling at 8:50 p.m. than at any other time of the day. *See Miranda–Enriquez,* 941 F.2d at 1084 (the Court could not give weight to the fact that the stop took place at 9:00 p.m. because, although the agent testified that at 3:00 a.m. the chances were probably fifty-fifty that a car traveling on Highway 52 would contain a smuggler, he did not know what the likelihood would be that a car would contain a smuggler at 9:00 p.m.) *Id.* at 1084.[15] *Cf. United States v.*

---

**14.** One of the unfounded assumptions upon which Agent Harrison's suspicion rested was that defendant must have been traveling directly from Las Cruces. Another is that she must have been traveling northbound to Deming.

**15.** Agent Harrison testified that between January and February 1994, four loads of marijuana were seized that came from Anapra Road. The only significance of such a fact is that it shows that Anapra Road is, at times, used for transporting illegal drugs. Otherwise, this fact is of no signifi-

*Leyba,* 627 F.2d 1059 (10th Cir.1980) (the fact that stop took place at 2:55 a.m. was significant because not only was there testimony that traffic was extremely light between 2:00 a.m. and 7:00 a.m., but in addition, there was testimony that the majority of alien trafficking on Highway 180, the highway where the defendant was stopped, actually took place between those hours.); *Pollack,* 895 F.2d at 687 (the Court found it significant that the stop took place between 3:00–3:45 a.m. because there was testimony that at that time of the morning it [was] very unlikely to have a vehicle on Highway 85 *and* that at such an hour a very, very small percentage of traffic that was stopped on Highway 85 was legitimate traffic) (emphasis added).

The agent testified that traffic in this area was lighter at 8:50 p.m. However, he did not estimate the percentage of traffic that would be *illegitimate* at 8:50 p.m. Nor did he testify as to one single instance where he stopped a vehicle at 8:50 p.m. and uncovered illegal activity. The fact that traffic is lighter at 8:50 p.m. does not indicate that it is more likely to be illegitimate. Without some objective indicia that vehicles traveling at 8:50 p.m. are likely to be transporting illegal aliens, the Court cannot give weight to Agent Harrison's unsupported assertion that such a factor was "suspicious." To do so would risk arbitrarily labeling all who travel at 8:50 p.m. as "suspicious." *See United States v. Sanders,* 937 F.2d 1495, 1501 (10th Cir.1991).

■ Agent Harrison testified that his suspicions were raised because defendant was driving a big, old vehicle, of the type used by many illegal alien smugglers. He also testified that defendant's particular model of car could be used to smuggle as many as ten illegal aliens. However, on cross-examination, he conceded that such vehicles are very common in the Columbus area of New Mexi-

co. Furthermore, he conceded that defendant's vehicle was not heavily loaded. Any independent significance that the agent attached to the fact that defendant's car was big and old should have immediately dissipated when the agent observed that the vehicle, apparently occupied by only one person, was not heavily loaded. To characterize a big, large car based solely on its physical properties as "suspicious" would risk labeling the vast majority of motorists who travel in the Columbus area of New Mexico as "suspicious" and subject to the whim of Border Patrol Agents.

■ Agent Harrison testified that he found it suspicious that defendant, a *female,* was traveling alone after dark on Anapra Road. Again, as with the factors examined above, the Court cannot ascribe significance to this factor. There was no testimony indicating that females who travel alone after dark on Anapra Road are any more likely to be involved in criminal activity than males who travel alone, or, for that matter, than people who travel together. Agent Harrison did not explain to the Court, in light of his past experience, how the presence of a female traveling alone on Anapra Road after dark was in any way indicative of criminal conduct. In fact, he did not testify as to a single instance where he stopped a female traveling alone and subsequently uncovered criminal activity involving the transportation of illegal aliens. Without such testimony, this Court cannot objectively evaluate the reasonableness of Agent Harrison's "suspicion" in this regard. Moreover, in light of the absence of such testimony, it appears that Agent Harrison's suspicion was founded upon nothing more than outmoded stereotypical notions. Stops based on such notions are completely at odds with the Fourth Amendment's requirement of reasonableness.

cance to the Court because there was no testimony concerning the circumstances leading to the seizure of the marijuana. It is unknown if the drugs were intercepted by means of traffic stops and, if so, whether those stops were constitutional. It is unknown at what time those stops occurred. It is unknown whether the vehicles were stopped for traffic violations. If stopped upon reasonable suspicion, it is unknown what

factors supported the reasonable suspicion. If the agent had testified that the stops took place around 9:00 p.m., and under circumstances similar to the stop in this case, then those stops would be of considerable significance to the Court's determination in this matter. In this regard, the Court could then specifically attach significance to the time of the stop in this case.

Agent Harrison also found it "suspicious" that defendant: (1) stopped at the stop sign; and (2) glanced at him. According to Agent Harrison, most motorists run the stop sign at the Columbus intersection. Following Agent Harrison's logic, a car that obeys traffic laws is more "suspicious" than one which disobeys such laws.[16] Even if obeying the traffic laws is an "uncommon" occurrence in Columbus, New Mexico, the Court cannot impute the reasonableness of Agent Harrison's inference that such conduct is "suspicious" absent information connecting Agent Harrison's past experience with illegal alien smuggling to the conduct at issue here. The Court simply cannot evaluate based on Agent Harrison's limited testimony whether one who stops at this particular stop sign is more likely to be involved in criminal activity than one who runs the stop sign.

With respect to defendant's glancing towards Agent Harrison, there was no testimony indicating that glancing at a law enforcement officer who is scrutinizing one's vehicle is at all unusual, much less that it is suggestive of criminal conduct. *Monsisvais*, 907 F.2d at 990–91. Clearly, such behavior is "susceptible to unsuspicious interpretations." *United States v. Guillen–Cazares*, 989 F.2d 380, 384 (10th Cir.1993). Agent Harrison's characterization of defendant's glancing at him as "suspicious" conduct does not withstand rational analysis.

Next, the agent found it "suspicious" that defendant turned north from Anapra Road. He testified that the vast majority of traffic turns south from Anapra Road and that normally no local traffic will be on the roads at 8:50 p.m. Agent Harrison concluded that "it's smugglers" that go north. However, he conceded on cross-examination that not all traffic that turns north will be illegitimate. Furthermore, Agent Harrison could not estimate what percentage, if any, of the

small minority of traffic turning north would be involved in criminal activity.[17] In addition, Agent Harrison testified that north of Anapra Road on Highway 11 there are several houses, a motel, and, on North Boundary, a street perpendicular to Highway 11, there is a residential "neighborhood." He also testified that Highway 11 is the main thoroughfare between Columbus and Deming, the latter city having a population of 20,000. Thus, there are many legitimate reasons why a motorist may turn right onto Highway 11. The Court cannot conclude that Agent Harrison's "suspicion" that defendant was engaged in the transportation of illegal aliens by virtue of turning north at the Columbus intersection was a reasonable one. Stated in other words, Agent Harrison could not rationally infer from the fact that defendant turned north that she was likely to be involved in criminal activity, specifically the transportation of illegal aliens. *See United States v. Escamilla*, 560 F.2d 1229, 1232 (5th Cir.1977) (the Court could not ascribe weight to the driver's decision to make a left-hand turn, stating that "it simply is not unusual that the particular route chosen by a driver does not coincide with a route Border Patrol Agents consider more direct or common.").

Agent Harrison's "suspicions" were also fueled by the speed at which defendant was traveling. According to Agent Harrison, defendant turned the corner very slowly and continued to travel slowly northbound on Highway 11 until Agent Harrison pulled in behind her at which time defendant increased her speed, although she continued to travel below the speed limit.

Such conduct is clearly susceptible to unsuspicious interpretation. With respect to defendant's slow speed as she turned the corner at the intersection and traveled northbound prior to Agent Harrison pulling in behind her, such speed can be attributed to

---

16. Such a conclusion appears to run counter to common sense. Furthermore, it would put the law enforcement officer in the classic "heads-I-win, tails-you-lose" position, *United States v. Escamilla*, 560 F.2d 1229, 1233 (5th Cir.1977), where he could stop the defendant for violating a traffic law and at the same time stop the defendant for comporting with the traffic law because he considers such conduct to be "suspicious."

17. Agent Harrison testified that he stops approximately 90 percent of those cars which turn north onto Highway 11. He could not estimate of that 90 percent how many vehicles were illegitimate. In addition, he did not explain the circumstances which led him to stop the vehicles in the first place.

legitimate factors, such as the poor lighting conditions on Highway 11, the fact that it was dark outside, and the fact that defendant was unfamiliar with the area in which she was driving. Since Agent Harrison was aware at this point that defendant's vehicle had Dona Ana license plates, he could reasonably infer that her slow driving was attributable to her unfamiliarity with the area and the fact that the lighting was poor. Instead, Agent Harrison found this conduct to be "suspicious" and decided to pull in behind defendant to check her license plates. When Agent Harrison pulled in behind defendant, her speed increased, even though it continued to be below the speed limit. Agent Harrison perceived this conduct as "suspicious." However, he did not explain to the Court why such conduct was indicative of criminal activity, specifically the transportation of illegal aliens. Agent Harrison's characterization of such conduct as "suspicious" does not withstand rational analysis. When someone is following in close proximity to one's vehicle, whether that person is a law enforcement officer or not, and one is traveling under the speed limit, one is likely to increase one's speed so as not to irritate the driver behind, especially where he is traveling very close to one's vehicle. In this case, there was testimony that Agent Harrison pulled in close behind defendant in order to check her license plate. In light of the legitimate reasons that could account for defendant's conduct and in the absence of testimony by Agent Harrison explaining *why* in light of his past experience with the transportation of illegal aliens such a factor was significant, the Court can ascribe only minimal weight to this factor. Certainly, the Court cannot ascribe the kind of weight afforded by the Tenth Circuit in other cases where the driving maneuvers of the vehicles at issue were consistent with the "classic alien smuggling pattern" that agents had previously encountered at checkpoints, *see, e.g., Pollack,* 895 F.2d at 690, or where the conduct by the defendant was obviously evasive and the agent knew that vehicles which took such action often carried illegal aliens. *See, e.g., United States v. Merryman,* 630 F.2d 780, 783 (1980) (Border Patrol agent knew that vehicles that took U-turns prior to the checkpoint near Truth or Consequences often did so to evade the checkpoint and often carried illegal aliens.).

■ Agent Harrison testified that as defendant traveled northbound she repeatedly glanced at the agent, specifically five times. Defendant denied glancing at the Border Patrol agent. She testified that she was not aware of the agent's presence until he pulled in behind her on Highway 11. As the Court has stated earlier, Agent Harrison's testimony in this regard was not credible. However, even if the Court were to accept that defendant glanced around five times at the agent, such conduct is still "susceptible to unsuspicious interpretations," *see Guillen–Cazares,* 989 F.2d at 384, and would be entitled to only minimal weight. It is not unusual, especially in a poorly lit, dark area to be vigilant of those that are traveling within close proximity. Even when one recognizes that the driver is a law enforcement officer, glancing over at an officer is not an unnatural or unusual reaction: Is the officer following me? Am I doing anything wrong? Why is he still following me? When is he going to turn off and stop following me? Furthermore, the Court notes that even according to Agent Harrison's version of the facts, defendant's attention was not so distracted by the presence of the Border Patrol agent that she weaved within her lane or crossed the dividing line.

■ Finally, Agent Harrison testified that he had reasonable suspicion to stop defendant's vehicle when she made an "abrupt" right-hand turn onto North Boundary after the Border Patrol agent pulled in behind her because he perceived it as an attempt to evade him. The Court made a factual finding that defendant made the turn because Agent Harrison was attempting to pull her over. Even assuming, arguendo, that defendant made this abrupt right turn before Agent Harrison turned on his emergency equipment, the Court does not find such conduct to be of substantial probativeness. The United States Supreme Court in *Brignoni–Ponce,* specifically noted that "obvious" attempts to evade officers may support reasonable suspicion. *Id.* 422 U.S. at 885, 95 S.Ct. at 2582 (emphasis added). In light of the physical conditions of the area, defen-

dant's unfamiliarity with it, and the undisputed evidence that defendant was traveling below the speed limit, the Court does not consider that defendant's actions were *obviously* evasive. Even if the Court were to assume that this right-hand turn made while traveling under the speed limit was "abrupt" there are legitimate reasons why defendant may have made an "abrupt" right-hand turn. For example, since the area was not well-lit and in view of the fact that defendant was not familiar with the area in which she was traveling, defendant may not have seen the turn until the last minute, thus causing her turn to appear "abrupt." Also, the mere fact that she turned right does not indicate that she was "obviously" evading the officer. There was no testimony suggesting that North Boundary was a desolate, isolated road leading to a dead-end. In fact, there was testimony to the contrary, that is, that North Boundary was a "residential neighborhood" with a school and a swimming pool. Certainly the agent could not make a rational inference that because defendant happened to turn right she was likely to be engaged in criminal activity, specifically transporting illegal aliens. Furthermore, as soon as defendant turned right, she stopped for the agent. Such conduct is inconsistent with the conduct of one who is attempting to evade a law enforcement officer. The defendant's driving behavior here, even as characterized by Agent Harrison, simply does not elicit the same types of logical inferences and suspicions as other obviously "evasive" maneuvers that the Tenth Circuit has encountered in roving patrol cases. *Monsisvais,* 907 F.2d at 991 (distinguishing the maneuvers of defendant in that case from those of the motorists in *Pollack.*). *Cf. Pollack; Merryman.* The defendant's conduct in making an abrupt right-hand turn is susceptible to unsuspicious interpretations. Thus, in considering the totality of the circumstances, even if the Court were to assume that defendant made an "abrupt" right-hand turn, the Court could give only limited weight to the officer's perception that defendant was trying to evade him.

In the Court's totality of the circumstances analysis, it gives considerable weight as required under *Brignoni–Ponce* to the following factors: (i) Anapra Road is a well-known drug and alien smuggling route; (ii) Anapra Road is located three miles north of the Mexican border. The Court, however, recognizes that not all traffic on this road is illegitimate and that these factors alone will not warrant the stop of every vehicle present on Anapra Road. Other factors to be considered in looking at the whole picture and to which the Court has ascribed significance are as follows: Defendant's vehicle did not appear to be heavily loaded, *see Miranda–Enriquez,* 941 F.2d at 1081; Agent Harrison observed just one person in defendant's vehicle; Agent Harrison did not notice that defendant was Hispanic until he stopped her vehicle; Agent Harrison had not received any information about recent illegal border crossings in the area, *see id., see also United States v. Abdon–Limas,* 780 F.Supp. 773, 779 (D.N.M.1991); sensors located along Anapra Road indicated that defendant had not stopped along Anapra Road so no inference could be made that she had picked up illegal aliens on this road, and, further, no inference could be made from the sensor activity that she had crossed the Mexican border. *Cf. United States v. Sperow,* 551 F.2d 808 (10th Cir.1977).

## CONCLUSION

Under the totality of the circumstances, the Court cannot conclude that Agent Harrison had reasonable suspicion that defendant was engaged in transporting illegal aliens to support the stop of defendant's vehicle. To condone such a stop would permit Border Patrol agents to stop every motorist who happens to travel along Anapra Road at 8:50 p.m., glances at the Border Patrol agent who is scrutinizing her vehicle at the Anapra Road/Highway 11 intersection, happens to turn right, northbound, onto Highway 11, and after the agent pulls in behind her and turns on his emergency equipment makes a right hand turn while traveling below the speed limit in a poorly lit area.

At the hearing, Agent Harrison had little trouble enumerating numerous factors that purportedly weighed into his determination of "reasonable suspicion." However, what he

**1420**

could not articulate to the Court was how such factors related to his past experience or the experience of fellow agents in combating criminal activity, specifically the transportation of illegal aliens. The Fourth Amendment's requirement of reasonableness demands at a minimum that the government provide the Court with such an objective basis for determining the validity of roving patrol stops.

Furthermore, because Agent Harrison articulated so many "suspicious" factors that do not withstand rational analysis, the Court is left with the distinct impression that such factors did not, in fact, weigh into his determination of "reasonable" suspicion prior to the stop. Instead, it appears that Agent Harrison acted upon nothing more than a gut instinct or a mere hunch which by chance unfolded criminal activity. Agent Harrison could just as easily have been wrong and intruded upon the privacy interest of an innocent traveler.[18] Only in an after-the-fact last-ditch effort to justify the stop does he raise numerous innocuous factors that he now conveniently characterizes as "suspicious." Such a methodology is completely at odds with the purposes and mandates of the Fourth Amendment and risks subjecting countless motorists to the whim of Border Patrol Agents.[19]

**WHEREFORE, IT IS ORDERED** that defendant's motion to suppress is **GRANTED.**

---

18. In fact, Agent Harrison technically did get it wrong because his suspicion that defendant was involved in transporting illegal aliens proved to be erroneous.

19. In Justice Douglas' dissenting opinion in *Brignoni–Ponce,* he predicted precisely the kind of misuse of the *Brignoni–Ponce* factors that manifested itself at the hearing in this case. He stated:

by specifying factors to be considered without attempting to explain what combination is necessary to satisfy the test, the Court may actually induce the police to push its language beyond its intended limits and to advance as a justification any of the enumerated factors even where its probative significance is negligible. *Brignoni–Ponce,* 422 U.S. at 890, 95 S.Ct. at 2584.